This of the day is 4-10-0-2-6-4 in re the Marriage of Michelle Conover and Eric Conover. We have for the appellant, Donald Heck Jr. and for the apple leaf, Gerald Timmerwolke. Mr. Heck. Good morning. May it please the court, Mr. Timmerwolke. The judge will hear, basically, on what I consider to be a, and I believe the law would consider to be, basically, a travesty of what's happened. The situation is, and I don't mean to make light of any of my points, but the custody is what we're primarily here for. But they're all involved in one issue or one form or another leading up to custody. First issue that's presented by us on appeal is the, what I will refer to as the Davis exclusion. Now, when you make, and I believe that that's justifiably expected, when you make, as I did and as Mr. Timmerwolke joined in, a motion for exclusion and a motion to segregate as much as you can. Now, we realize in the trial level that we don't have really much of the capability of segregating witnesses in Davis County, but in this case it was not only important that they were brought in before the court and they were told don't talk to each other about this. Well, the evidence, and we have quoted the basic and the transcription line, title, and page, where the Davis's did exactly that. In essence, what they did was they sat in the courtroom, specifically Mrs. Davis, Sue Davis, and what she did was, and this is a poor analogy, but she muled out information. They talked about what was being done, they talked about what was being said, so the exclusion really meant nothing. Everything that before the next witness was called, it seemed like, they knew what the prior witnesses had said. We believe that the court, as we put in our brief, erred in allowing her to testify. What authority stands for the proposition that courts can do that? I know they can exclude witnesses from being present. If there is no... What authority does the court have to say, by the way, if you're present, you can't talk about this with anyone else or what? I think the court has the authority to chastise the people, and I believe that the court has the contempt power if once they are told not to do that, they do that. Well, where does the authority come from the court, to the court, to tell them not to do that? Well, I believe that... You can exclude... I was a trial judge for a long time, counsel. I know that, sir. And, you know, you can exclude people from the courtroom who are going to be witnesses. Where do I get the authority as a trial judge to say to anyone who is going to be present, who hasn't been excluded, you can't talk about what you hear or see with anyone else? Well, I don't think that you can say that. I don't think there's any inherent power for you to do that. But I think there is power for you to say, if you're going to testify, and if you're going to be brought before this court, don't talk to other people. And when you go outside... Well, where does that come from? What part of... I used to hear lawyers talk about it all the time. I never did it. I didn't think I had the authority to do it. I think my authority is... To be honest with you, I've never been asked that question. So I can't, as I stand here now, say... Well, if we're going to find reversible error for the trial judge, shouldn't we have some authority that says... Well, I believe you haven't... I've always believed you have inherent authority within the rest of the court to control your courtroom. To control the courtroom? To control the courtroom. Okay. And as such, in controlling the courtroom, if you step outside and then you violate or you dramatically confront the authority of the court, I think that is contemptible. So I can't, you know, it's one thing to control the courtroom, but that extends to the kitchen table or coffee shop down the street two hours later? Well, not after the trial is over. No, while the trial is still going on? While the trial is still going on, I think the court can do that. I understand that apparently we're on a different page here, but if not, then why should we ever make the motion? It's made all the time. Well, I used to hear it all the time, too, and I'd say, okay, I'm going to grant you a motion to exclude witnesses, and that's it. You know, just exclude witnesses and tell them to shut up. The second part, I never understood why lawyers even thought I had the authority to do that. I still believe that you do, but I can't quote you case or statute. Your Honor, as far as going on is concerned, I'm going on and I'm going to, I guess, compound these and put one on top of the other. That when we started this case, when we started, it actually started under the nature of an order of protection. And in the order of protection, there were many things brought up, but I think that poured over into the demeanor of the trial court as well as the ruling of the trial court. When we started this thing, when we started the order of protection, the thing that Mr. Tim Wohlke, on behalf of Mr. Conover, was raising most of all, was the fact that, first of all, these things did not happen, that Michelle Conover said it happened as far as the abuse, and also that there had been this molestation of a younger brother. And I believe that certainly, if that was congruent or even close to the time of any of this or was tied together, that it may have serious bearing on not only the count two or the second part of our appeal, but also on the division of the 602 or the discretionary setting of the child custody. The judge made it very clear from the beginning, it's on the record, we've cited it, that this is 16 years ago. At best, it started perhaps 16 years ago. At best, it stopped 19 years ago. You're going to have to show me that this somehow is relevant to today. Mr. Tim Wohlke said that I realize I need to show this and I'm going to have to have an expert witness. Well, there were actually two expert witnesses called at this trial. One was called Dr. Frank Fulman and Dr. Fulman said nothing of the sort. He said nothing that he found any abuse or he found any problem with Michelle Conover. That wasn't significant enough because Mr. Tim Wohlke, I suggest to this court, didn't have enough and he thought he didn't have enough, so he asked to have the parties and the children examined by Dr. John Day. Actually, it wasn't Dr. Day initially, the gentleman that Mr. Tim Wohlke wanted to have do the examination or was talking about was not available, so Dr. Day was chosen. We objected to that, but the court over my objection allowed that to happen. Well, after it happened, when they got up there, Dr. Day and Dr. Day's records, my client took everything. I don't know what more she could have taken. It's all in the record. She took transcripts. She took court records. She took everything that she should have taken to expose herself, her soul, her individual to Dr. Day. Dr. Day not only examined all of those, but Dr. Day gave the million multifaceted test. He also gave the million test, the inventory test, and on top of that did hours and hours of counseling with her, the child, the children together. Did it with the appellee, Eric, did all of these. It came back that, in his opinion, that my client, Michelle Conover, was in the best interest for Michelle to have custody of those children. And there was never anything found as far as her propensity for sexual abuse. Well, counsel, here's my concern about all this. You're arguing this as if, Dr. Day, that's the beginning and the end of this inquiry. That Dr. Day thinks your client should have been the custodian. What's the trial judge in this situation, the potted plant in the courtroom? No, the judge is not the potted plant in the courtroom. Well, then why isn't Dr. Day's testimony just one of several things for Judge Bailey, who is one of the more experienced judges in this district, whose work we see a lot. He had the chance to see and hear everybody in this proceeding, did he not? He had the chance to see and hear everybody. But that is why we have suggested to this court that his decision was not only against the manifested evidence, if that's not what the function of this court is, to review these, then obviously there should not be an appellate court. Well, counsel, it's interesting you put it that way, because I'll tell you, I can't speak for my fellow panelists, but we're supposed to be deferential to discretionary calls, such as who would be the better parent, based on my experience as a trial judge. There is no single ruling by the trial court, I think, more entitled to deference than this one. I had lots of child custody matters myself, and there is a dynamic that occurs in the courtroom, in my opinion, that the judge, as a careful observer, can see and hear as he evaluates all of this evidence and decides this case, that we, from a cold record, cannot. And your burden, when you are challenging on appeal, that ruling and asking us to reverse it, is to demonstrate not that Judge Bailey was wrong, but that he was unreasonable, that this was an unreasonable decision, but no reasonable person, based on what was before Judge Bailey, could have possibly reached this decision. Judge, the evidence before Judge Bailey, first of all, was, I'm not going, these are from Judge Bailey's mouth, that I am not going to pay any attention to any of this unless you tie it together. It was never tied together, that's one. Was he required to say that, or to do it? I believe that he is required, if he's going to lay out the parameters, if he's going to say... Maybe he changed his mind. He never said he changed his mind. But within your very argument, if he didn't follow the parameters you're suggesting, he might have changed his mind. He might have, but he didn't... Was he required not to? He was not required not to, but he's got to have some evidence to do it on. If he says that he's not going to pay attention to the allegations of abuse, and then he says, I'm not going to do that unless I get some evidence, he had no evidence. Secondly, when you look at the physical, or if we look at the parameters of 602, obviously 602 is discretionary, I agree with that. But 602 has got to be based on something. He had really nothing of evidentiary stature to do this with. His argument or his findings were unreasonable. At the end he made some comment to the effect, I'm not going to give you, meaning my client, the opportunity to abuse this child, meaning her son. There was never, never any allegation of child abuse of the two girls. Never. As far as the two girls were concerned, and as far as all three children, my client was the primary custodian of those kids. There's no question about that. The testimony of Eric Conover even said, well, because I was out playing golf, he was the breadwinner, he was the money man, and the findings were that basically I'm not going to keep it that way. We then had two separate people. We had two psychologists say it was in their best interest. We had a guardian ad litem say it was in their best interest. We had two children, both of which are of not minor ages. We had two children, Lauren and Samantha, both testified before the court, telling them what they thought, told them about the abuse of their father within the home. And when you look at the parameters of 602, I think it is real clear when you put everything together that his ruling was unreasonable. Did you mean to say abuse of the father or abuse of the mother? Abuse of the father. He didn't find that in the order of protection. But we've heard testimony from Michelle. We've heard testimony from Samantha, who was a child, I believe at that time, of 15 or 16 years of age. We've heard testimony from Lauren, another child, who testified of the screaming, the yelling, the abuse within the home. And the reality of it is, in light of all of that, then he says, basically Judge Bailey said, I'm disregarding Judge Day's, excuse me, Dr. Day's review because you weren't honest with him. And there's nothing in this record that supports that. She took him, as I've already said here today, she took him everything. She took him the transcript of her brother Chuck's deposition. She took him the transcript of everything. You've got it in the record. I'm a little confused. I thought that the status of the law was such that a guardian ad litem or a child representative had to be appointed in these cases. I did too. There was one, correct? Well, there was a guardian ad litem appointed, but she, who the guardian ad litem was a young lady, that she did not appear in the courtroom. She just was appointed to, I guess, determine the wishes of the children as to where they wanted to go or where they wanted to be. Did you reference that in your facts in your brief? I believe so. Because we mentioned a guardian ad litem. What was the guardian ad litem's position? The guardian ad litem's position was that they should be with their father, actually with their mother. The guardian ad litem's position, Dr. Froman, Dr. Day, everybody said the same thing. And there's no evidence to the contrary. There was evidence that was presented such as, well, weren't you turned in to DCFS? Somebody, and it came out through the testimony, Ms. Conover's mother or father, one of those two, turned her in to the DCFS. And that came back and found her. The children, the youngest, the oldest girl, Samantha, was struggling in school. She always struggled in school. The other two children, Lauren was an honor student, and a boy was progressing along with his class, matriculating through the lower grades of St. James Lutheran School. She had always been a stay-at-home mother. She had always taken care of the children, and nothing was shown that she didn't or didn't facilitate the father-child relationship. It was to the contrary. We showed to this court everything that we could show. And as Justice Steinman said, somewhere along the line, he changed gears, but he didn't have any evidence to do it all. I can't see, and if you review, even if you put the evidence most favorable to Eric Conover, it's unreasonable to reach a conclusion that Judge Bailey did. Did you say Michelle took Dr. Day the transcript of her brother's testimony? Yes, sir. And does the evidence show that she discussed? It follows her brother's testimony of her brother's deposition. Deposition. Yeah. Does the evidence or the record show that she discussed with Dr. Day the accuracy of her brother's deposition? She said that, I believe the record shows that she discussed with Dr. Day the entire accuracy, that they talked about that in some detail based upon his testing, based upon his experience, and Dr. Day's CV is, I believe, in the record, that he felt that there was nothing of consequence to that when it came to placing custody of these children. Nothing of consequence? As far as the... Are you saying that Dr. Day determined that it didn't happen? I don't know he determined it didn't happen because what Dr. Day said, based upon his testing, based upon his review of the facts, and based upon his review of the individuals, he felt that it wasn't, there was no danger. That's what he was sent to do. That's why they went, why Eric Conover and Mr. Timothy wanted... So Dr. Day's recommendation to the court, or opinion, I should say, as to custody, accepted the allegations of her brothers being true? I can't tell you that, Your Honor. Doesn't that matter? Well, I think it matters that it was exposed to him. Well, doesn't it matter in evaluating his testimony, and wasn't it important that you clarify which of these two positions he had? The two positions are, as Justice Sterner is bringing out, one, I don't believe it happened, or two, it happened, but I don't believe it was significant. I think that he never reached that conclusion because he never was... Did you ask him to clarify? We tried to ask him to clarify. I tried to bring him back before the court. He wanted to come back before the court to testify, and Judge Bailey wouldn't allow it. You mean this was just left up in the air as far as... I filed motions, I filed post-trial motions to bring Dr. Day. Let's straighten this out to bring him before the court. Well, how is it in his report that he's such an expert, that he didn't address that issue directly? I think he addressed it from the standpoint of... Then which of the two alternatives did he pick up? I think that what he did was, his directive was not to determine truth or falsity. His directive was, based upon the statements of Judge Bailey, is, first of all, if it happened, is she a danger to these children? And he ruled, his opinion was, she is no danger to the children. And he took all of these things into account. Now what he did as far as moving this along in his thought processes, we never were given that. And that was simply because Judge Bailey wouldn't allow it to happen. And I asked for it. Did he submit a report? Is that what came before Judge Bailey? There is a report before the court, yes, Your Honor. It's in the transcript. And in his report he didn't address... No, he went through everything that was presented to him. It's all in his report. And I can address that, but I just assumed that it being in the record, I shouldn't go through it, especially when the time is up. I have other matters here, the division of property, the maintenance award, that I haven't had time to address. My time is up. If I get time at the end, I will certainly do that. But I don't want to make light of those either. It's important that we realize that I, or my argument is, and continues to be, that this ruling on the custody was against the manifest way of the evidence. The ruling on the custody was not reasonable. It just simply was not reasonable in light of all the facts. And I think you have to look at the testimony presented. There was never any showing that Michelle was their bad mother. There was never any showing that Michelle abused her children. There was never any showing of anything of that regard. And I ask this court to reverse Judge Bailey. Thank you, counsel. Mr. Timberwolke. Good morning, Your Honors. Thank you for your attention this morning, Mr. Heck. First of all, the guardian ad litem did not make a recommendation as to custody. I have her summary in front of me. And she simply said that the parties needed counseling, and she didn't believe that joint custody would work. And she goes on and says, in the event Eric receives custody, he's requesting she receives standard visitation. In the event she refuses counseling services, if he's awarded sole custody, he feels there should be no overnight visitation. In the event Michelle receives custody of the three children, she goes on and sets out what she wanted for visitation. So the guardian ad litem did not make a recommendation. This case is one where when the appeal is brought before this court, the burden of proof on the appellant is to show that there's been a great abuse of discretion that makes an injustice with respect to the facts in this case. And if the courts, if Your Honors would read Judge Bailey's decision, one of the few times that you see a reversal in a custody case is when you see a judge that picks out maybe one issue and dwells on that and ignores the entire evidence as presented. And it's clear from Judge Bailey's ruling that he considered everything. With respect to the best interest rule, we have Michelle who starts out in 2007, according to the father, she begins leaving the family. We have loads and loads of evidence. When did that start? In 2007, according to the father. And it continued until it really became bad in the spring of 2008 where she was spending most of her time with her horse. He noticed she was coming home at night sleeping. We had abundance of evidence in the first hearing from three pharmacists that we brought in that she was taking hydrocodone. We had a doctor's record that was admitted by stipulation from Dr. Wallace for a local clinic. The Quincy Medical Group had cut her off of treatment because he said over the last year, year and a half, she was showing up for sinus infections, yeast infections, a sore hand because she fell asking specifically for Lortab. Judge Bailey even found that he'd looked at the number of pills she had access to and he found that she was at least taking three a day. Well, the problem is Mr. Heck hasn't addressed this and didn't address it in the first part of the brief. Judge Bailey, when he looked at what the evidence was and when he looked to see the report of Dr. Day, he said, I can't believe Dr. Day's report because she doesn't even acknowledge that she was abusing hydrocodone over this time. And he came to the conclusion that she took, in 631 days, he listed the number of pills based on the evidence that we had and he said she was at least taking three pills a day during this time period if you spread it out. The second thing that came to the attention of the judge and the most important thing is that Mr. Heck brings in the issue of the sexual abuse. Judge Bailey, in the order of protection, when we were looking about abuse issues, and those abuse issues were one incident at the house where two different versions were given, when Michelle Conover gave the information to Dr. Day, she neglected, and I argue this at the final closing argument, and I say it again, she neglected to give Judge Bailey's decision. And Judge Bailey gave a very detailed decision. It wasn't in the package given to Dr. Day where Judge Bailey said the father clearly did not abuse the wife in this case. It was a domestic argument. The situation was clear that he's never abused these children. He's no harm to these children. And the judge dismissed the order of protection. In fact, the judge assessed 3,000 of her own fees, told her she had to pay 3,000 of her own fees because in his conclusion in the end he felt she bought a frivolous order of protection that we spent days in court on arguing about bringing the police officers in, bringing the witnesses to that occurrence in. So it's a situation clearly where Judge Bailey looked at all the evidence. With respect to Dr. Day, I think it's very interesting with Dr. Day because Judge Bailey said he's found that there was no evidence of drug abuse. Well, that's true, but he did it based on Michelle Conover saying, I don't have a drug problem. I didn't abuse any drugs. In fact, she gave specific information to the guardian at Lytton where she went through and said, I just took the Lortab over a few months over the summer. And that was clearly contrary to the evidence that the judge had before him with the pharmacist and the number of pills she was taking in and Dr. Wallace's report that they had to cut her off from medicines at the ambulatory care at Quincy Medical Group because she was showing up every month wanting hydrocodone in some form or another. With respect to the issue that Judge Bailey also said, he started out and he said, well, Mr. Timberwolke, in the order of protection, we're here to look at this abuse issue. We're here to look when the husband and wife get in an argument, the wife's claiming that the husband has her hand in the door and is hurting her hand, the husband's saying he's trying to close the door and the wife's coming in the bathroom and he's on the phone calling his in-laws trying to get her not to come in the bathroom to avoid a confrontation and a fight. That's what the judge heard. Well, Dr. Day, when he got down to the part about the sexual abuse with the brother, he took her word for it. And she said, no, I never sexually abused. Justices, we're not talking in this case about one experimental thing between a brother and a sister. A sister who is eight years older than a little brother, we're talking about a period of four to five years that this went on and it was sexual intercourse and it was in detail. And yes, the deposition was given to Dr. Day, but Dr. Day wasn't in the courtroom. He never personally interviewed her brother, Chuck Davis. He never personally was in court and watched him testify as Mr. Heck, according to Judge Bailey, unmercifully cross-examined him. And the ultimate thing in the end when I asked Mr. Davis about some of the things he testified to and Mr. Heck said, well, why didn't you tell the nuns? You were in a Catholic school. Why didn't you tell the priest? Why didn't you tell your parents about what was going on over this time period? He said, because she was my big sister and I trusted her. And Judge Bailey clearly could look at this when he sees Dr. Day's report and Dr. Day reads the transcript, totally ignores it, doesn't pursue an evaluation with respect to the issue and simply finds she has no problems. She's not an abuser. Well, maybe that's what his test showed, but he wasn't in the courtroom to make that call. And Judge Bailey saw all the evidence. He heard Mr. Davis testify about what went on between he and his sister and he's the one that made the call. In the case, it's not a situation where we had evidence and we told that to the judge the very first time. We had no evidence throughout this case that there's been any molestation by Michelle with the youngest child. We had no evidence of that whatsoever. What we had is evidence that it went on for a long period of time and it was never dealt with and where Judge Bailey changed his mind, as Judge Steinman just said, can a judge change your mind? I'm not sure where he changed his mind is when you have her originally telling her brother when he confronts her about it. In September of 08, when Charles, the brother, came and confronts her, she says, I don't remember it happening. If it did, I'm sorry. Then the two brothers confront her, both brothers confront her again, and she then denies it. And this was a repetitive thing that Judge Bailey found that her own father testified to. She constantly switches stories. She admitted to her mother, her father, and Margaret Mansfield. Didn't you concede, though, that you would have to get an expert to tie the sexual abuse up with the issue of custody? No, I don't concede that. Did you concede that to the trial court early on in the proceedings? In the order of protection because there we were talking about that abusive factual situation and the judge did cut me off and he even said, that may be down the road. He said, you might have to prove an excess to that, but that may be down the road in the custody proceedings. He never said that it would be a situation where it couldn't be introduced. And I always wondered, and I argued to the judge both during the trial and the closing argument, you have subsection 9 of the best interest rule, and there's really very little case law on it, but it says in there that the courts can consider whether one of the parents is a sexual offender. It doesn't say they have to be convicted. It doesn't say they have to be felons, although Judge Bailey did make a finding in part of his decision that he felt Michelle Conover had committed felonies, specifically stealing hydrocodone from her own grandfather, which she admitted to her friend Margaret Hansel, her father and her mother, in September when they confronted her. And then she later took her boyfriend in and told her father that she wanted to retract all that in January of 2009. She wanted to retract all that and recant on it because she was just under a lot of pressure at the time. And her own father's testimony was that she was devious, that she would change her story, that she couldn't give a truthful statement about issues that were very relevant, that he and the family were concerned about. But the other thing I'd like to point out to the court, and Judge Bailey made a very clear issue of this, Michelle Conover, in her way she dealt with this thing, he said she started the separation by the five weeks of the order of protection by not getting, the father got no visitation. And the father testified the day he was served the order of protection that children literally were crying when he left that house. When the police officer said, you've got to get out of the house, they were crying. By five weeks gone by, his testimony was, the next time I saw the children, the two girls, they were on me big time. The mother had already convinced them that the father was lying about her abuse of hydrocodone. He had abused her. They already saw their father as an abuser. They already saw their father as a controller. And Judge Bailey picked up on that very well. And the big picture in this case is what Judge Bailey said, is one of the things that a good parent will do is foster and create a good relationship with the other parent. That wasn't done in this case, and Judge Bailey clearly defined it and saw it. And he said not only was it not done with him, she cut her whole family out. She cut off her brothers. She cut off her parents. She cut off everybody. She basically started a new life with her then boyfriend and she brought one witness into court that was a high school friend that pretty much testified that she'd seen her with the children and that she was doing a good job with the children. So the surroundings that she did, and one of the things that struck me, this was a piece of evidence that I thought was very relevant to the case. One of the issues that came out was at one point the daughter's Facebook. This is Samantha, the oldest one. It had all the posties on it. And there was a postie that one of the... Excuse me, I don't know what a postie is. People send you a message and you can put it, you can post it up on your Facebook. And so one of the messages on there that somebody told Eric and it ultimately came to court was that Michelle sends the daughter Samantha on Facebook a message that says expect the best, be prepared for the worst, F what others think, and do your own thing. And so when that was brought to the court's attention and when Ms. Conover was told about it, she said, well, that was really a mistake. Yeah, it did come from my computer, but somehow Samantha got on my computer and took something somebody sent me and sent to hers. And the problem that you have in that is is she monitoring her daughter's Facebook to see some kind of note like that? And if you want to look at Dr. Day's report, here's what Judge Bailey also had. He had a profile of Mrs. Conover, angry, here's her personality type, she's angry, somewhat sullen, mistrustful person, hostility, anxiety, insecurity, disregards authoritative figures, blames others for her problems, sees the world as a threatening place, unjustly blames, she's unjustly blamed for other people's problems and she's getting a raw deal out of life. And Dr. Day also said, with respect to Eric Conover, that he was social, that he was adjusted, that he had a personality that was conducive to raising these children. The only defect he saw in his problem is that he had a little bit of an inferior complex about he didn't want people to think badly of him, which I personally argued to the judge. I didn't think that was a bad trait at all. I think it's a good trait that you want people to think positively of. Yet Dr. Day recommended that he not be the custodian? Dr. Day did recommend that. But Judge Bailey said Dr. Day didn't have the right facts. Dr. Day did not have her true story about the abuse of the drugs because she flat out denied it. And what she did is her parents talked her into going into a hospital and to seek some treatment. And she went in, she took a test, and it was negative and she walked out against doctor's orders. I'm curious, you heard Mr. Heck's argument that Dr. Day was prohibited from testifying. How did that happen? I can tell the court that. I'm glad you asked that question. This case went on a long time. And Judge Bailey, we had two or three days of trial in December. I know it's in the record. Mr. Heck at one point talked about, are we going to have Dr. Day here? Are we going to have Dr. Day? Because the judge then scheduled this for, I think, January 14th and 15th. He said, we're going to conclude the trial. And he offered to consult that time. He said, we're not going to continue this case beyond those days. If you want to bring Dr. Day in, you can bring Dr. Day in. You can take a deposition or whatever. I was never offered by Mr. Heck to take his deposition. Mr. Heck did not bring him to court on those days. And the fact is Judge Bailey accepted the report. You mean you had two full days of trial in this custody case? Oh, no, more than that. We started August 9th. I think we had three or four days in December. Some of them were half days. Judge Bailey has an early morning docket. And I'm considering to the court, and it's in Mr. Heck's, the first part of his brief, I'm thinking we have five or six days of the custody hearing. So there were a lot of witnesses called. Mr. Heck never called Dr. Day? He never called him. I didn't call him. He didn't call him. We submitted the report. In regard to several of the other issues that were raised, there's no law that says that a husband and wife can't talk about testimony, and that's what Judge Bailey said. And he said to Mr. Heck, you know, hey, can you prove prejudice? Can you prove harm? Can you prove that Mrs. Davis lied as a result of talking about the case with her husband? And there was no evidence of that. With respect to the issue of the house, they say that it was improper, that she didn't get any equity in the house. The house was valued at $446,000. At the time of the trial, there was $420,000 in liens. There was no equity there. Mr. Conover was obligated to pay, not including his own fees, he had to pay almost approaching $35,000 to $40,000 in attorney fees. He had to assume about $16,000 in credit card bills. What is his occupation? He's a stockbroker, financial advisor. How did the court come up with his salary in order to set payments? Mr. Heck subpoenaed in his employer, his supervisor, and a lot of Mr. Heck's argument throughout the trial was he was putting Mr. Conover at like $396,000. That was the banner year. That's the year that we all made money in the stock market, That was 2007. Mr. Graw was subpoenaed by Mr. Heck. He went in, and I believe the evidence that the court heard is he would probably approach $200,000 gross income that year. So that evidence was there before the court. There was some suggestion, argument by Mr. Heck, that Mr. Conover was backing off his business. Mr. Graw testified that he didn't see that whatsoever, that Mr. Conover seemed as diligent in his business, although he obviously had the divorce on his mind as the proceedings took over a year and a half, that he didn't see any effect on his business. He wasn't turning down business. So the $200,000 was somewhat just an educated guess? No, the records were in there. There were exhibits shown, and we provided all the way up to trial. We provided Mr. Heck had access all the way right up to the days of trial, and we provided that as the trial progressed, his monthly statements. They were there, and they're in the records. So he gets a statement on his commissions and his gross, and all that was provided. With respect to, I did want to bring one other point up, with respect to the issue about the debate, or that she didn't get a fair share of the house equity and that she didn't feel she got enough maintenance, I think one of the important issues in this case is not only did he have to pay a lot of bills, Mr. Conover was saturated with the bills that came out of the marriage, but in addition to that, Mr. Conover had, besides paying all the bills, he had to continue on with the bills while the case was going on, while Mrs. Conover and Judge Bailey saw it, that this was expending huge sums of money on credit cards. There was an inactive credit card that she somehow activated that had been dormant with the parties for several years, and she ran it up to $15,000. Judge Bailey found that a lot of the expenses were not necessary. She did tell, the final thing I'd like to say is, she did tell the guardian ad litem, because Dr. Froman was her counselor, and the issue came up about, she needed treatment, and was there a drug problem out there, was there sexual abuse problems, and she told the guardian ad litem, it's in the guardian ad litem's report, the reason I stopped going to Dr. Froman right after he testified in court is because I didn't have the money. But yet, on the other hand, we showed some of the exorbitant credit cards, the amount of money she was spending on credit cards, and Dr. Froman's visits were $50, and she collected, which I argued to the judge, that she, through pure romance, bought coochie cream for $50, but she didn't have $1 to spend to see Dr. Froman when she had these issues out there. So, this is a case, your honors, with all due respect, Mr. Heck, there was overwhelming evidence that Judge Bailey looked through, saw, looked at all the evidence, looked at the total circumstances of this case, and made a correct decision that's not against the manifest way of the evidence. Thank you. Thank you, counsel. Your butthole, Mr. Heck. Thank you again, I please the court. Mr. Timofey said that the judge considered everything. When the judge considered everything, then that even makes it even more an abuse of his discretion. When he considered the issue of the hydrocodone, the hydrocodone issue was that she had not had a hydrocodone, even if she had abused hydrocodone, which there was never any evidence of that. She had taken a large amount of them. She didn't deny that. She never denied it. The last time she had taken hydrocodone was, I believe, in September, and the record speaks of this, in September the year before. So, it had been over a year since she had taken a hydrocodone capsule of any kind. As far as the abuse is concerned, any abuse that was ever alleged, brought before the court in any manner, ended at the very latest 19 years and maybe even as far as, at the very latest 16 years, maybe as far as 19 years before any of this was brought to the court's attention. The bottom line is, is that prior to the filing, as I put in my brief, prior to the filing of this, she was a lovely mother. They were living the dream world. As Justice Turner asked, the money was at one year, and it's all in the record. Eric made, I think, $350,000, $400,000. He's capable of doing that. Contrary to what Mr. Timberlake said, I believe it was $247,000 he was going to make in the year 2009. That's all in the record. Contrary to that, Mrs. Conover Michelle was a stay-at-home mother. She hadn't worked, didn't work. He didn't want her to work. He wanted to stay home with the kids. So as far as having monies, the monies were there. The monies will continue to be there. They lived a lifestyle. They were married 15 years. They lived a country club lifestyle. They had lunches. They lived on Country Club Drive. They lived that lifestyle. So to say that, as an example, that the court considered everything, if the court considered everything, it had to ignore the majority of the evidence. And if anything, he was blinded by this fact. We didn't want Dr. Day. We didn't ask for Dr. Day. Mr. Timberlake says, well, Dr. Day was used. Eric was ordered to pay and did pay $7,000 for Dr. Day's expertise in this matter. That's not a small amount of money. And as a result of that, Dr. Day came back with a decision they didn't like. When we came into court, Dr. Day wasn't available. And his report was never questioned. It was never questioned until we came into the courtroom. Is it in the record that Dr. Day wasn't available? I don't know if it's in the record or not, Justice. I don't know. What do you mean he wasn't available? I don't understand. He's in Peoria. He's not at Quincy, Illinois. He had prior commitments on the day of the trial. We had two final days set. As I recall, he was not available on that day, on those days. And it really wasn't that important because Dr. Day's report, as far as him not seeing this or not doing that, had never been questioned prior to that time by Mr. Timberwolke, by the court, or anybody else. As far as this whole family thing is concerned, this family has been estranged for years, even while Eric and Michelle were living together as man and wife. So to say that all of this was part of Michelle's doing, and then we bring in this stuff like he just did, the coochie cream, that whole thing is just a ruse. That whole thing was explained by my client. The whole thing with her spending money, he cut her off. I'm sorry. I'm a little confused about what you just said about the family being estranged. Her and her mother and father, that part of it. I thought that during this alleged incident of abuse, that Eric called Mr. and Mrs. Davis? That's after separation, or while they're separating. So there's some contact. There's contact. They live within maybe a half mile of each other. But Michelle and her family had very little to do with each other, even during any of the last months or years of their married life. And when all of this is happening in 2007, this marriage is breaking up. This is not a situation where all of a sudden Michelle says that's enough. They had gone to counseling. The record speaks of that. They had tried to put this marriage back together. His maintenance was insufficient. What should have it been? I'm sorry, sir. What should have the maintenance award been? The maintenance should have been more in the area of $5,000 to $6,000 a month. He was making, at that point, a little over, according to the evidence presented by not only Eric, as Mr. Timberwolf said, but also by Mr. Graw. He was going to be making, after taxes, around $195,000 to $200,000 a year. I believe that's the evidence. It is supported by the record. Thank you. That's all I have.